### GANDY et al. v. CAMERON STATE BANK.
### (No. 7150.)

Court of Civil Appeals of Texas. Austin.
Nov. 16, 1927.

Rehearing Denied Jan. 25, 1928.

1. **Mortgages** ⊗═⇒390—**Judicial foreclosure and foreclosure under power cannot be prosecuted concurrently.**

A judicial foreclosure and a foreclosure under a power cannot be prosecuted concurrently.

2. **Mortgages** ⊗═⇒337—**Foreclosure under power cannot be resorted to until abandonment of previously instituted judicial foreclosure.**

Where judicial foreclosure has been instituted, foreclosure under a power cannot be resorted to until a definite abandonment of the judicial proceeding, since former constituted an election of remedies.

3. **Mortgages** ⊗═⇒337—**Decision to abandon judicial foreclosure proceedings and proceed under power held not tantamount to abandonment, where no notice is given, nothing filed, nor costs paid (Rev. St. 1925, art. 2089).**

Bank's decision to abandon judicial foreclosure proceedings and to proceed by foreclosure under a power *held* not sufficient abandonment to keep its foreclosure under power from being void or voidable, where no notice was

given and nothing was filed in case to indicate its abandonment and costs were not paid as required by Rev. St. art. 2089, for discontinuance in vacation.

**4. Mortgages ⚖⇒369(3)—$2,000 held so inadequate for land sold under trust deed as to require sale's being set aside where worth at least $10,000.**

$2,000 *held* such an inadequate price for land sold at trustee's sale under power in trust deed as to require sale's being set aside, where evidence showed land was worth at least $10,000, and the one exercising sale power had previously instituted judicial foreclosure proceedings without having abandoned them; such being calculated to confuse trust deed grantor.

**5. Mortgages ⚖⇒369(3)—Only slight circumstances are necessary to set aside sale under power in trust deed, where consideration is grossly inadequate.**

Only slight circumstances are necessary to invoke the aid of equity to set aside a sale made under a power in a trust deed, where consideration is grossly inadequate.

**6. Mortgages ⚖⇒369(6)—$2,000 for $10,000 land sold under trust deed power held so inadequate as to entitle junior lienholder to have sale set aside, where senior lienholder had not divulged sale was to be held.**

Where, under power in trust deed, land was sold, to bank making loan, for $2,000, although it was worth at least $10,000, price *held* so inadequate as to entitle junior lienholder to have sale set aside, since junior lienholder's attorney, even though junior lienholder is not entitled to sale notice, was not notified of sale though the day before sale he had conversed with senior lienholder's attorney relative to bank's claim.

**7. Trespass to try title ⚖⇒47(3)—Pleadings in trespass to try title held to warrant any relief sustained by evidence, and not to restrict defendants to particular title pleaded.**

In trespass to try title, where petition contained an alternative count setting up debt and lien and seeking foreclosure while defendants, one being a junior lienholder, set out facts in the entire controversy, pleadings *held* sufficient to warrant any relief supported by evidence and not to restrict defendants to any particular title pleaded.

**8. Mortgages ⚖⇒369(4)—Tender to trust deed lienholder of debt amount entitled grantor and junior lienholder to have void or voidable foreclosure sale set aside without tendering trustee's sale fees.**

Tender to bank, trust deed lienholder, of entire amount of the debt due bank, entitled grantor and junior lienholder to have foreclosure sale, which was either void or voidable, set aside, without a tender of the trustee's fees in such sale being made.

### On Motion for Rehearing.

**9. Mortgages ⚖⇒369(3)—To set aside foreclosure sale made under power in trust deed, for gross price inadequacy, fraud need not be shown.**

In order to have set aside a foreclosure sale, made under a power in a trust deed, for gross inadequacy of price, existence of fraud need not be shown.

**10. Mortgages ⚖⇒369(3)—Accident or mistake is sufficient where gross inadequacy of consideration exists to set aside foreclosure sale under power.**

Accident or mistake is sufficient, where gross inadequacy of consideration exists, to set aside a foreclosure sale made pursuant to power in a trust deed.

**11. Mortgages ⚖⇒369(5)—Foreclosure sale under power in trust deed may be set aside for gross inadequacy of price, even where relief claimant has not been as diligent as ordinarily required.**

Foreclosure sale under a power in a trust deed may be set aside for gross inadequacy of price, even in cases where the person claiming relief has not in every respect met that degree of diligence which ordinarily the law would require.

Appeal from District Court, Milam County; E. M. Dodson, Special Judge.

Action of trespass to try title by the Cameron State Bank against Mrs. Elizabeth Gandy and another. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

Leslie C. Merrem, of Yoakum, and E. A. Wallace, of Cameron, for appellants.

W. A. Morrison, of Cameron, for appellee.

McCLENDON, C. J. Appeal by Mrs. Elizabeth Gandy and the Southern Memorial Company (defendants below) from a judgment upon a directed verdict awarding to Cameron State Bank (plaintiff below) 100 acres of land in Milam county.

The litigation arose out of these undisputed facts:

January 26, 1923, Mrs. Gandy, owner of the land, executed a trust deed thereon to Graves, trustee, securing the bank in payment of a $1,500 note, bearing 10 per cent. interest, and due January 1, 1926. March 11, 1924, she executed a trust deed on the property securing the memorial company in two notes of $638 each, bearing 8 per cent. interest, and due one and two years from date. These trust deeds were promptly recorded. On June 14, 1926, the memorial company sued Mrs. Gandy on its notes and to foreclose its trust deed lien. Judgment of foreclosure was rendered, order of sale issued, and the land advertised to be sold December 7, 1926. September 24, 1926, the bank sued Mrs. Gandy upon its note and to foreclose its trust deed lien. Citation was promptly issued and sent to the sheriff of Harris county, who served it, "but not in time for the defendant to answer at the November term, 1926," which convened the second Monday in that month. This suit the bank dismissed December 4, 1926. Meanwhile, November 1, 1926, Graves executed a written refusal to act as trustee,

---

⚖⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

and Mangum was appointed in his stead. The latter, as trustee, upon the bank's request advertised the property to be sold December 7, 1926. On the morning of that day, Mangum sold the property to the bank for $2,000, and executed to it a trustee's deed. That afternoon the memorial company bought in the property under its foreclosure sale. December 10, 1926, the bank brought this suit against Mrs. Gandy, the memorial company, and another in trespass to try title for the land, and in the alternative to foreclose its trust deed lien. December 30, 1926, the memorial company reconveyed the land to Mrs. Gandy, reserving a vendor's lien to secure notes aggregating $4,018.90. Mrs. Gandy and the memorial company alleged various irregularities in the bank's trust deed sale which they sought to set aside, and tendered to the bank, and paid into the registry of the court, on January 5, 1927, $2,000, which amount was a little in excess of the principal, interest, and attorney's fees on the bank's note on that date, but lacked a few dollars of being sufficient to pay additionally the trustee's fees. There are a number of issues presented questioning the regularity and validity of the bank's trust deed sale, but as we have reached the conclusion that the sale should be set aside on the ground that the institution of the foreclosure suit by the bank constituted an election of remedies and invalidated any proceeds under the trust deed so long at least as that suit was pending, it will be unnecessary to discuss other alleged irregularities.

[1] While there is some diversity of view among the decisions of other states upon the subject, the holding in this state is that judicial foreclosure and foreclosure under a power are remedies which cannot be prosecuted concurrently, and institution of the former constitutes an election of remedies and precludes subsequent resort to the latter. Cameron v. Hinton, 92 Tex. 492, 49 S. W. 1047; Sabine Co. v. English Co. (Tex. Com. App.) 291 S. W. 1088; Avery v. Loan Agency (Tex. Civ. App.) 62 S. W. 793; Holland Texas Hypotheek Bank v. Broocks (Tex. Civ. App.) 266 S. W. 183; Neill v. Johnson (Tex. Civ. App.) 234 S. W. 147.

[2] The bank contends that there is no irrevocable election of remedies until judicial foreclosure is prosecuted to judgment, up to which time the lienholder may abandon the judicial proceeding and resort to his other remedy under the power. This proposition may be conceded, but it has no application we think to this case. The authorities cited are clear that the two remedies cannot be concurrently pursued, and it necessarily follows that where judicial foreclosure is first instituted foreclosure under the power cannot be resorted to until after a definite abandonment of the judicial proceeding. The suit was filed September 24, 1926, and remained pending until December 4, 1926. The declination of Graves, the substitution of Mangum, and the notices and advertisement of sale were all had within the period—November 1 to November 12. The bank had full control over the case until it was dismissed, and the above proceedings under the trust deed, which were absolutely essential to the sale, were voidable, if not in fact absolutely void, at the time they were had.

Anent the dismissal the bank's attorney testified that when he discovered that the memorial company had advertised the property for sale on December 7, and Mrs. Gandy had not been served in time for the November term of court, he consulted with the bank and decided to dismiss the case and proceed under the trust deed. He did not, he testified, dismiss it then because the regular judge was disqualified and another judge had not then been arranged for. No notice was given Mrs. Gandy that the suit would be dismissed other than what might be inferred from the fact that the property was advertised for sale under the deed of trust, and nothing was filed in the case to indicate its abandonment.

[3] We find no merit in the contention of the bank that its action in the premises was tantamount to an abandonment and dismissal of the foreclosure suit. R. S. art. 2089 reads:

"The plaintiff may enter a discontinuance on the docket in vacation, in any suit wherein the defendant has not answered, on the payment of all costs that have accrued thereon."

This statute has been in effect with little modification since very early times (see Paschal's Dig. art. 1440), and has been often resorted to and construed. It is plain and unambiguous and furnishes a ready means whereby a plaintiff may dismiss his suit without any action of the judge. We hold that the failure of the bank so to dismiss, whether designedly or by inadvertence of its attorney, continued the proceeding under its control until the order of dismissal of December 4, 1926.

[4] In addition to the foregoing holding, we are of the view that the bank's trust deed sale should be set aside for gross inadequacy of consideration. The record shows that the land was worth at the lowest estimate $100 an acre, and the various disinterested witnesses valued it at from $100 to $150 an acre. One of these, a loan agent, testified that for loan purposes it was worth $140 an acre, and that he could obtain a loan on it of $70 an acre. The bank paid only one-fifth of the lowest valuation.

[5] It may be that gross inadequacy of consideration alone is not sufficient to set aside a trustee's sale. But it is generally held that only very slight additional circumstances are

necessary to invoke the aid of a court of equity.

In view of the above holding, it will not be necessary to detail in extenso what the record shows in this regard. We believe the evidence sufficient, from the viewpoint both of Mrs. Gandy and the memorial company, to set the sale aside for gross inadequacy of consideration.

Briefly: The record shows Mrs. Gandy acquired the land on the death of her husband about 1920; · that she had never had any business experience, and had little if any knowledge of business matters, and no knowledge of legal proceedings. She lived in Houston, had no attorney representing her; and while her testimony that she did not receive notice of the trust deed sale may be subject to question, it seems plain from her testimony that she did not understand its import as being a proceeding distinct from the foreclosure suit. The fact of instituting and prosecuting the two proceedings concurrently was no doubt calculated to confuse, and this fact together with the other circumstances noted were sufficient, we think, to set aside the sale where the consideration paid was so grossly disproportionate to the actual value of the property. The bank could not be injured in any way by setting aside the sale, since it had a first lien on the property worth from 5 to 7½ times the amount· of its debt, which drew 10 per cent. interest per annum, the highest rate the bank could lawfully charge for its funds and provided a 10 per cent. attorney's fee for collection or suit.

With reference to the memorial company, the record shows that its attorney in the matter, Merrem, who lived at Yoakum, had never examined the title back of the memorial company's trust deed, and had no knowledge of the bank's lien until the day preceding the sale. In the afternoon of that day he telephoned the sheriff that he would be in Cameron the following morning to buy in the property for his company under its foreclosure. In this conversation he learned for the first time that the bank had a lien on the property. He also then learned that Morrison was attorney for the bank, and he then telephoned Morrison in regard to the matter. His testimony and that of Morrison are in conflict as to the exact import of this conversation. Under his version, he was led to believe that the bank was contemplating immediate proceedings to foreclose its lien, but there was no intimation that the property had been advertised for sale or would be sold on the following day. He told Morrison he would meet him in his office the following morning and, if the bank's lien was superior to the memorial company's, he would pay off the former. His testimony was that he could and would have so arranged. Morrison's testimony on this subject we quote in full:

"On the day preceding the sale, about dark or probably a little after, I was called to the telephone stating that Yoakum wanted me. I went to the telephone to reply to that call. Somebody at the other end of the line stated to me what his name was. The name I do not recall, but I recall that he said he was attorney for the Southern Memorial Company and that he wanted to know if I was the attorney for the Cameron State. Bank.. I told him that I was. He then asked me if the Cameron State Bank had any lien on the Gandy land. I told him that it did. He asked me if I knew whether it was due or not. I told him it was long past due for some six or eight months. He said that we have a judgment against Mrs. Gandy for ·the Southern Memorial Company. I stated, 'Yes, I had discovered that.' He said, 'Is your—do you contemplate,' he said, 'Is your lien prior to ours.' I said, 'Yes, sir.' He said, 'Are you contemplating enforcing your lien?' and I said, 'Yes, sir; immediately.' He said, 'Well I have got the land advertised for sale to-morrow.' I said, 'I am aware of that fact,' and he said, asked me was Mr. Hardy the president of the bank, and I told him he was. He said: 'I will be in your office in the morning by 8 o'clock. Will you be down that early?' I told him I did not usually come down until about 8:30 but would come by 8 o'clock if he wanted to see me. It never occurred to me that that he was coming except on the railroad. While he did not tell me how he was coming, I just thought a man in Yoakum at that time of night who was going to see me the next morning at 8 o'clock in Cameron would come on the train which came in here then between 6 and 7 o'clock in the morning; I do not remember the exact time. I went down to my office at 8 o'clock and nobody appeared. I waited until 9 o'clock and nobody appeared, and then I went over to the bank. I told them that I had had a conversation with a gentleman from Yoakum who told me he was coming up to see about the Gandy land and asked if he had been there. They replied that ·he had not, and I went back to my office and stayed there until just at 10 o'clock. We had the land advertised for sale between 10 o'clock a. m. and 4 o'clock p. m. I then went by the bank and got Graves and told him that we would go over to the courthouse and sell that land and for him to get Mr. Mangum."

Merrem left Yoakum at 3 a. m. December 7 by auto, but after proceeding some distance found very heavy and boggy roads, and finally about 10 a. m. had to give up the trip. He then telephoned the sheriff and ascertained that the bank had already bought in the property under its foreclosure proceeding. He later arranged with a local attorney for the sale under his company's foreclosure.

[6] Even under Morrison's testimony, it appears that no mention was made of any proceeding then pending to foreclose the bank's lien, or of any impending sale on the following day, and Merrem remained in ignorance of such proceeding until after the bank's purchase. The memorial company was not notified of the bank's trust deed sale, and as a matter of law notice to it was not required, it being a junior encumberer. However, in view of the fact that it had no knowledge of,

the proceeding we think the conversation between its attorney and Morrison above quoted entitled it to have the sale set aside where the inadequacy in price paid by the bank was as gross as shown by the record.

A large part of the bank's brief is devoted to the contention that neither the memorial company nor Mrs. Gandy is in a position to question the regularity of the bank's trustee's deed: Mrs. Gandy, because she claimed in her pleadings under the deed from the memorial company to her of December 30; and the memorial company, because its claim was under its foreclosure sale, which was subsequent to the trustee's sale. The rule in trespass to try title actions that a party is restricted to his pleaded title is invoked.

[7] The contention is overruled. The bank's petition, while containing at the outset a count in trespass to try title, followed this by an alternative count setting up its debt and lien, and seeking foreclosure. The pleadings of Mrs. Gandy and the memorial company set out fully the facts in the entire controversy, showing that the bank's original claim was based upon a deed of trust Mrs. Gandy had given as owner of the land. All subsequent proceedings were alleged and various grounds for setting aside or declaring void the bank's trust deed sale, including the grounds above discussed, were urged. The pleadings were sufficient to warrant any relief in favor of Mrs. Gandy or the memorial company which the evidence sustained. It was in evidence that prior to the memorial company's foreclosure sale Mrs. Gandy had an arrangement with that company by which she could reacquire the property by paying her indebtedness to it within three years. This arrangement was afterwards carried out by the deed of December 30, 1926. Mrs. Gandy never lost all interest in the property by reason of the memorial company's foreclosure, and whatever rights she had at the time of the sale to set it aside she always thereafter retained. We also think it clear that, independently of her continued rights in the premises, the memorial company as a junior lienholder could set aside the sale for reasons above stated. It additionally acquired under its foreclosure whatever rights Mrs. Gandy had in that regard that did not thereafter remain in her.

To maintain the bank's contention would virtually cut off all right of all parties to set aside the sale whatever the grounds therefor might be. Both Mrs. Gandy and the memorial company, the latter as a junior lienholder, had up to the time of the bank's purchase the right to redeem the land from its debt, and that right gave each an interest in the validity of that sale. On what sound principle of law this interest is thus wiped out under the bank's contention, we are unable to conceive. Neither party did anything subsequent to the sale to in any way jeopardize

such rights or to adversely alter the position of the bank. Immediately after the sale negotiations were begun between the attorney representing Mrs. Gandy and the memorial company and the bank's attorney looking towards a discharge of the bank's debt, the final result being that the latter virtually informed the former that the bank would not accept the money but would claim the land.

We overrule the several contentions of the bank in this regard.

[8] It is further urged that the tender was not sufficient, because it did not include the trustee's charges. This contention is also overruled. The action of the trustee being invalid (whether void or voidable it is unnecessary to determine), the appellants were entitled to have the sale set aside upon tender of the full amount of the bank's debt. The bank was not entitled to the expenses it had incurred in making a sale which it could not uphold.

The trial court's judgment is reversed, and judgment is here rendered annulling the bank's trustee's deed, and decreeing title to the land in suit in Mrs. Gandy, subject to the vendor's lien notes in favor of the memorial company. Judgment is rendered in favor of the bank for the $2,000 deposited in the registry of the district court. The costs of the trial court up to January 5, 1927, are assessed against appellants. All subsequent costs in the trial court and on appeal are assessed against the bank.

Reversed and rendered.

### On Motion for Rehearing.

The only point raised in appellee's motion for rehearing which we think requires further notice is the contention that we did not fully set forth the facts with reference to Merrem's information regarding the trustee's sale prior to the time he was notified about 10:30 a. m., December 7, 1926, by the sheriff that the sale had already been made. Appellee's contention in this regard is that the sheriff testified that in a telephone conversation the previous afternoon he told Merrem that the bank had advertised the property for sale, and that this was not denied by Merrem. We quote the following from the sheriff's testimony:

"If I remember correctly, I told him the Cameron State Bank had the same land advertised for sale, or was setting up a claim to it, or, anyway, they had advertised it for sale, setting up some kind of claim to it and had advertised it for sale."

Merrem testified:

"He (the sheriff) said, 'I think the Cameron State Bank is claiming a lien on the land.' * * * I did not know anything about any other lien; it was a big surprise to me. Yes, sir; he told me where I could find out, made suggestions as to who I might communicate with with reference to the claim of the bank. I asked him

who I could telephone to to find out, and he said either Mr. Hardy or Mr. Morrison; he said W. A. Morrison was the attorney for the bank, and I understood him to say Hardy was the president of the bank, anyway he was one of the officials, so I told him I would call on both or either of these people."

The sheriff's testimony shows that he did not know when the property would be sold under the trust deed; that he had not seen the advertisement, and that his information upon the subject was gained from Mangum, the substitute trustee, some time prior through a conversation in which Mangum stated that he was going to foreclose under the trust deed. It also appears from the sheriff's testimony that Merrem told him he was not going to Cameron by train, but would leave Yoakum in a car about 3 a. m., and expected to arrive in time for the memorial company's sale. This fact the sheriff communicated to Morrison about 9 a. m. and prior to the trustee's sale. We quote further from Morrison's testimony:

"We came over here, and the sheriff said—he told me that he had had a communication or wire from Mr. whoever his name is, I think this gentleman here (indicating Merrem); he says it was him; and that he was coming up here to the sale and was going to start at 3 o'clock that morning. I went back and told Mr. Graves. In the meantime he had come over to the courthouse with Mr. Mangum, and we said we would wait awhile and see if those people were going to come from Yoakum. We waited until 10:25 and no word came from anybody at Yoakum or from this gentleman or anybody else, and we went and told the sheriff that we were going to sell some land and for him to come out and call up a crowd for us."

It will thus be seen that the sheriff's testimony is somewhat uncertain as to exactly what he told Merrem, further than to advise him that the bank was claiming a lien on the property, and directing him to the president and attorney of the bank for further information. It is clear from Merrem's testimony that he only gathered from his conversation with the sheriff that the bank was claiming a lien and who the president and attorney of the bank were. The testimony of Morrison quoted in our original opinion with reference to the conversation he had with Merrem clearly indicates that the latter had no knowledge that the property was advertised for sale, and he was seeking to obtain from Morrison exactly what the status of the bank's claim was. It is also clear from Morrison's testimony that he did not advise Merrem that the property had been advertised for sale and there is no intimation anywhere in the testimony that Merrem had any knowledge that the sale would take place on December 7th. It is further to be noted that Morrison made an engagement to meet Merrem at the former's office on the following morning, the only purpose for which was an adjustment of the bank's lien; and while Morrison's testimony is to the effect that this engagement was for 8 o'clock in the morning, and he presumed Merrem would arrive by train, he knew by 10 o'clock and prior to the sale that Merrem was coming by car. The sale was made about 10:30 a. m., and it was about that time, or at any rate not later than 11 a. m., that Merrem telephoned the sheriff and was then advised that the bank had already sold the property.

[9] As stated in our original opinion, only slight circumstances are necessary to set aside a sale of this character, where the consideration paid is grossly inadequate. It is not essential that fraud should exist, and we have not found, nor do we now find, that the record presents a case of fraud or bad faith. The testimony quoted from, however, speaks for itself. In our original opinion we refrained from comment thereon, and we pretermit comment here.

[10, 11] Accident or mistake is sufficient where gross inadequacy of consideration exists to set aside a sale. Nor is it always essential in such cases that the party claiming the relief has in every respect met that degree of diligence which ordinarily the law would require.

Appellee contends that its attorney made no misstatement to Merrem, but answered all his inquiries correctly; that it was under no duty to give any information to Merrem; and that the answers given met every obligation the law requires. We do not controvert this strictly legal view of the situation. The facts remain that Merrem had no knowledge of the impending sale; that he was making a bona fide effort to get the facts; that his efforts, however imperfect, were unsuccessful in the essential element that a sale would take place the following day; and that he was then in position to and doubtless would have protected his clients' interest had he been successful in ascertaining this essential fact.

Again: If the memorial company had had actual knowledge of the bank's lien and had kept track of the record proceedings in regard thereto, it would have discovered the foreclosure suit of the bank and would have been warranted in assuming that the bank had elected to proceed by judicial foreclosure and not by trustee's sale. This certainly would have furnished ample excuse for failure on the part of the memorial company to examine the bulletin board for notices of sale so long at least as the bank's suit was pending; and since that suit was not dismissed until December 4th, the memorial company would have been excused from making any examination of the bulletin board for sales prior to the January sales' day. It certainly was not incumbent on the memorial company, assuming that it had kept track of the bank's foreclosure proceeding, to make an examina-

tion of the bulletin board as soon as the case was dismissed to ascertain whether several weeks prior to the dismissal the trustee had advertised the property for sale at the December sales' day.

Under all the facts and circumstances, we think a case for equitable relief is presented both as to the memorial company and Mrs. Gandy; especially so in view of the gross inadequacy of consideration and the total absence of injury to the bank in awarding such relief.

We are not by this discussion receding in any way from our original holding that so long as the bank's foreclosure suit was pending it must be held to an election of remedies by foreclosure and could not simultaneously foreclose through trustee's sale; and that therefore the trustee's sale was void or voidable at the option of Mrs. Gandy, or the memorial company. We adhere to that holding, as well as to the other holdings in our original opinion.

The motion for rehearing is overruled.

Overruled.